## IN THE U.S DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND
## (GREENBELT DIVISION)

| | |
|---|---|
| **APRIL T. ADEMILUYI**<br>324 Main Street#171<br>Laurel, MD 20707<br><br>                    Plaintiff<br><br>v.<br><br>**Carla N. Andrews**<br>3403 21st Street, S.E.<br>Washington, DC 20020<br><br><br>                    Defendant. | |

## COMPLAINT

Plaintiff, April T Ademiluyi brings an action at law against Carla N. Andrews for tortious interference with contractual relations and intentional infliction of emotional distress.  In support of her causes of action, Ademiluyi states as follows:

## INTRODUCTION

1.       The voters elected, Plaintiff, April Ademiluyi to the bench of the Circuit Court for Prince George's County in 2020.  Shortly after taking the bench, Judge Ademiluyi was assigned the child custody case of *Hawkins v. Lowe* CAD16-07166 where Plaintiff Judge Ademiluyi experienced public corruption first-hand. The Honorable Daneeka Varner Cotton ("hereinafter referred to as "Judge Cotton or Cotton") asked, in violation of Md judicial ethics rules and the Md Constitution, for Judge Ademiluyi to close the case, and Judge  Ademiluyi refused. Judge Ademiluyi was concerned about the welfare of children because the father alleged, they were living with a man facing child abuse charges. Judge Ademiluyi refused to close the case so that a social

worker could investigate the living arrangements of the children. Judge Cotton, however, was not concerned about the welfare of the children and insisted Judge Ademiluyi close the case.

2.      Plaintiff Judge Ademiluyi next discovered someone had forged her electronic signature on an order that Plaintiff, Judge Ademiluyi, did not sign and entered it on the record in *Hawkins v. Lowe* without her knowledge.   When Plaintiff, Ademiluyi attempted to investigate the forgery, she met repeated resistance from the Chief and Administrative Judge at the time, the Hon. Sheila T. Adams (hereinafter referred to as Judge Adams or Adams).   Judge Adams thwarted Ademiluyi's investigation by, among other things, instructing the courthouse and the Prince George's County Information Technology "hereinafter IT" department not to assist Ademiluyi in her investigation regarding who may have accessed her computer, signed the counterfeit order, and entered it in the record.   From her own investigation and her interactions with other judges, Judge Ademiluyi learned that Judge Cotton had entered an order in the same case to close the matter without consulting with Ademiluyi, who was the presiding judge. The counterfeit order had the effect of reopening the case.   Ademiluyi suspected the forger was either the Hon. Sheila T. Adams or Adams' friend on the bench, the Hon. Daneeka V. Cotton.  Both had displayed hostility towards Ademiluyi from the day she arrived at the courthouse.

3.      Ademiluyi decided to file a formal complaint against Judges Adams and Cotton with the Office of the Maryland State Prosecutor and the Maryland Commission on Judicial Disabilities, believing an investigation of the electronic evidence available at the courthouse would reveal the forger's identity.  It did.  The Hon. Sheila T. Adams suddenly resigned from her long-held position and retired from the bench.  Although Ademiluyi has not been permitted to inquire regarding the reason for Judge Adams' sudden departure from the bench, the timing of her departure suggests Ademiluyi's suspicions were confirmed.   The departure of Judge Adams marked the beginning of a coordinated campaign to retaliate against Ademiluyi for filing her

complaints.  The Honorable Michael R. Pearson (hereinafter referred to as Judge Pearson or Pearson) stepped into the fray, rallying behind his longtime mentor Judge Adams and his clandestine romantic partner Judge Cotton—who happens to be married—after Judge Ademiluyi rejected his sexual advances.

4.      Judge Cotton admitted she wanted consequences for Plaintiff Ademiluyi, writing to Investigative Counsel, "there should be some repercussions [for Ademiluyi's filing of her complaints]." Exhibit E.  But Judge Cotton's revenge quickly turned into a sinister criminal plot to hurt Judge Ademiluyi because she feared Judge Pearson's romantic interest in Judge Ademiluyi would end her romantic affair with Judge Pearson.

## PARTIES

5.      Plaintiff, April Ademiluyi, is an adult female and resident of Maryland, who address is 324 Main Street #171 Laurel, MD 20707. She was elected to the bench of the Circuit Court for Prince George's County in November of 2020.

Defendant, Carla N. Andrews, is a freelance court reporter, who resides in the District of Columbia.

## JURISDICTION AND VENUE

6.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the conduct complained of occurred in this district. Venue is also proper because Maryland has personal jurisdiction over the Defendant, due to the Defendant's actions that caused tortious injury within Maryland.

7.      This Court has diversity jurisdiction over the claims against Carla N. Andrews under 28 USC § 1332(a)(1) because the amount in controversy exceeds $75,000 and Carla Andrews is a resident of the District of Columbia and Plaintiff is a resident of Maryland.

## FACTS

8.      Judge Ademiluyi's electronic signature, without her permission, appeared on an Order while the file was not in her chambers. Properly concerned with how this could have happened, Judge Ademiluyi investigated the circumstances of how her electronic signature could have appeared on an Order that she did not sign.

9.      Judge Ademiluyi's attempt to investigate was resisted by Judge Adams.  Judge Adams made disparaging, disrespectful remarks, and outright refused to allow the IT Department to assist Judge Ademiluyi to investigate.

10.     Among other actions, Judge Ademiluyi contacted the Courthouse IT Department to find out who was accessing her password protected files where she kept her orders. She could not obtain all the information she sought because Judge Adams intervened.

11.     Judge Ademiluyi next sought assistance from Prince George's County IT for the audit logs to figure out whose computer was logging into her Microsoft Account without her permission. But Prince George's County IT produced logs that omitted most of that information. IT produced logs that provided a small number of entries of an identifier of a virtual desktop logging to Judge Ademiluyi's account that did not match the identifier of her virtual desktop. Judge Ademiluyi sent an email requesting the virtual monitor assignments for every computer user in the courthouse. And IT began changing the identifier of her virtual monitor. Thus, making it impossible for Judge Ademiluyi to figure out who was accessing her Microsoft Account.  Judge Adams used IT to deceive Judge Ademiluyi.

12.     Judge Ademiluyi next insisted Prince George's County IT connect her with Microsoft so she can inquire why the audit logs omitted the desktop computers identifiers but contained a few entries of a virtual desktop.   Judge Adams subsequently directed IT not to assist Judge Ademiluyi any further. The few entries of a virtual desktop identifier in the audit logs provided to Judge Ademiluyi were mistakenly produced. To deceive Judge Ademiluyi, IT intended to omit any identifier of a computer logging into Judge Ademiluyi's computer in the audit logs.

13.     Judge Ademiluyi knew there was an electronic evidence trail that would show the order was signed without her permission while the file was not in her chambers and likely identify the culprit who filed the counterfeit order. Therefore, Judge Ademiluyi took several steps to cause a more formal investigation.  She complained to the Office of State Prosecutors, which after a thorough review referred her to the Commission on Judicial Disabilities ("Commission'). Similarly, the Office of Fair Practice referred her to the Commission. And finally, the Chief Judge of the Court of Appeals and head of the administration wrote to her that he has no authority to investigate judges and her only option for an investigation was the Commission.

14.     Judge Ademiluyi thus provided information to the Commission about her suspicions that Judge Adams and/or another judge (upon information and belief--Judge Cotton) forged Plaintiff Judge Ademiluyi's signature on an order and were monitoring her emails to sabotage her work product.  Investigative Counsel requested that Judge Ademiluyi draft a complaint under oath against both judges, which she did.

15.     When Plaintiff, Judge Ademiluyi submitted complaints to the Office of State Prosecutors and to the Commission she became a whistleblower, engaging in conduct protected by the First Amendment of the United States Constitution.

16.     Upon information and belief, Judge Adams resigned because of Judge Ademiluyi's Complaint.  The timing of Judge Adams' resignation suggests she negotiated her resignation in

exchange for the Commission's agreement not to pursue administrative proceedings for sanctionable conduct against her.

17.     The Commission has a pattern and practice of issuing a letter to the complainant that they did not find the judge committed any sanctionable conduct in lieu of pursuing charges against the judge, but the rule requires that they inform the complainant that the Judge's retirement was the reason for them not investigating or pursuing charges.

18.     Although relevant, the Commission refuses to release the contents of the file that will show what led to Judge Adams' abrupt resignation shortly after Judge Ademiluyi filed her complaint.

### Judge Adams Causes Investigative Counsel to Open Case Number  CJD2022-079 Against Judge Ademiluyi In Retaliation for Ademiluyi's Complaint Against Adams.

19.     Judge Adams' initial hostility towards Judge Ademiluyi created a prior complaint against Judge Ademiluyi. Judge Adams caused the Commission to open investigation CJD2021-042 of Judge Ademiluyi around August 2021, and the Commission dismissed it in January 2022. The complaint alleged Judge Ademiluyi failed to report to work. Judge Ademiluyi, however, simply requested to observe a judge in a jury trial who was not hostile towards her. The Judge she was assigned to observe, Judge Sharon Kelsey, openly expressed her anger towards Judge Ademiluyi, and the day she was assigned to sit with Judge Kelsey, Judge Ademiluyi suspected that she just caused damage to her vehicle in the parking lot.

20.     As a result of Judge Ademiluyi's Complaint, Judge Adams grew increasingly hostile towards Judge Ademiluyi and retaliated.  Just before she abruptly resigned to avoid charges, Judge Adams submitted well over 500 pages to Investigative Counsel, and those documents formed the basis of the CJD-2022-079 ethics case against Judge Ademiluyi. Exhibit F.  Most of

the conduct at issue in CJD 2022-079 arose *after* Judge Ademiluyi filed her complaint against Judge Adams, and all the witnesses against Judge Ademiluyi were influenced by Judge Adams.

21.     Judge Adams in her second complaint, causing the investigation CJD2022-079, included items that she had not considered worthy of initially complaining about in CJD2021-042. For e.g., Judge Ademiluyi's campaign statement that was made in 2022 where she vows to stand up to judicial corruption was now a problem three years later when Judge Ademiluyi is complaining about Judge Adams and Cotton's corruption.

22.     In June of 2022, Judge Ademiluyi was in the process of completing her criminal jury trial training. The 7th Circuit new judge training is a tool that Judge Adams and Cotton use to groom judges for participation in their corrupt regime. A senior judge sits next to the judge in training solely to decide the case for them and to give the public the false perception that the judge in training is deciding the case in violation of Maryland judicial ethics rules and the Maryland Constitution. There is no other Circuit in Maryland that trains this way.

23.     On or about June 7, 2022, Judge Adams assigned Judge Ademiluyi to sit with Judge Cathy Serrette for her criminal jury trial training in *State v Carlos Lambright*, CT210423X. Judge Cathy Serrette told Judge Ademiluyi she could not rule against the defense attorney, who is also an elected Maryland Delegate, CT Wilson without Judge Adams' permission. Judge Adams's husband, Timothy Adams, was running for Maryland Comptroller, and they needed Delegate CT Wilson's support for their campaign. That need for CT Wilson's support is further evidenced in a campaign donation in February 2022 from Judge Adams's husband to Delegate CT Wilson. Judge Ademiluyi was disgusted and furious with Judges Serrette and Adams. Judge Ademiluyi and Judge Adams had a heated exchange about Judge Adams' corrupt motives in *Lambright* and Judge Adams and Cotton forging her signature in other cases. Judge Ademiluyi also got into a heated exchange with Judge Serrette regarding how Judge Serrette demanded her to rule.

7

24.     On or about June 30, 2022, the Commission began investigating Judge Ademiluyi, the whistleblower, in CJD 2022-079 while Judge Ademiluyi's complaint against Judge Adams was pending. Exhibit F Judge Adams requested the investigation of Judge Ademiluyi in response to Judge Ademiluyi's complaint against her.

25.     The malice towards Judge Ademiluyi is palpable in the Statement of Charges prepared by Investigative Counsel in CJD 2022-079 based upon information provided by Judges Adams and Cotton. The Statement of Charges alleged among other things that Judge Ademiluyi failed to disclose she was a rape "victim" in *State v Lambright,* a domestic violence case. It alleged that she is biased against those accused of violence against women, which is untrue.

26.     Even though the resignation and actions of Judge Adams and the actions of Judge Cotton are relevant, the Commission refused to disclose the Reports and Recommendations made for the Complaint Judge Ademiluyi filed against them. Investigative counsel produced a heavily redacted and incomplete file of Judge Ademiluyi's complaints against Judges Adams and Cotton. And Judges Adams and Cotton will not waive confidentiality of their files.

**Judges Cotton and Pearson Cause Investigative Counsel
to Open Case Number  CJD 2023-005 Against Judge Ademiluyi
In Retaliation for Ademiluyi's Complaints Against Adams and Cotton.**

27.     When Ademiluyi first took the bench in Prince George's County, Judge Pearson, who was divorced, began to show a personal interest in Ademiluyi.

28.     After Ademiluyi rejected Pearson's advances and after Investigative Counsel interviewed Judge Pearson in connection with the CJD 2022-079 case against Ademiluyi, Judge Pearson joined with Judge Cotton to cause a second case to be opened against Ademiluyi, that is CJD 2023-005.

29.     As the retaliation against Judge Ademiluyi was ramping up, she reached out via text to Judge Pearson to get his help with the retaliation unknowing that he like many others was

8

a part of Judges Adams and Cotton's CJD 2022-079 retaliation case. Exhibit C-D.  But Judge Pearson had already made a statement to Investigative Counsel that Judge Ademiluyi was difficult to work with.  Judge Ademiluyi also did not know Judges Pearson and Cotton were having a secret romantic affair.  Judge Pearson declined her invitation which caused Judge Ademiluyi to grow suspicious and confront him with whether he was a part of the retaliation.

30.     Judge Cotton became the Administrative Judge for the Circuit Court for Prince George's County on January 1, 2023.  Judge Adams' resignation was effective December 31, 2022.  Within one month of Judge Cotton starting her administrative judge term, Investigative Counsel started investigating the whistle-blower, Judge Ademiluyi in case number CJD 2023-005.

31.     Judge Pearson's own statements to Investigative Counsel show how right Judge Ademiluyi was about the retaliation scheme. For example, he shockingly alleges he fears Judge Ademiluyi will file a rape complaint against him and that she is trying to get him alone to falsely accuse him of rape when he is the one who first pursued a personal relationship with Judge Ademiluyi.  Exhibit A

32.     Judge Pearson also told investigative counsel that Judge Ademiluyi is trying to take down the "corrupt" sitting judges and that she is eager to file complaints against men, even questioning her mental state.  Exhibit A

33.     Similarly, Judge Cotton alleged she has concern for holding a bench meeting because she witnessed whenever Judge Ademiluyi and Judge Pearson interact, Judge Ademiluyi has a triggered emotional response to Judge Pearson.  Exhibit B

34.     Despite their "concern," neither Judge Cotton nor Judge Pearson attempted to discuss their concern with Ademiluyi.

35.     Judges Cotton and Pearson acted in further retaliation for Judge Ademiluyi's complaint that forced Adams's resignation and the complaint against Cotton and quickly ran to the Commission to do just that.

36.     On November 15, 2023, the Commission charged Judge Ademiluyi with harassing, threatening, and intimidating Judge Pearson through her communications with him because he alleges Judge Ademiluyi is trying to get him alone to falsely accuse him of rape. The Commission published the charges and Judge Ademiluyi's response to the charges on their website with more than half of Judge Ademiluyi's response redacted, without her consent. The Commission is misleading the public as to Judge Ademiluyi's response to the charges.

37.     At the public hearing for CJD2023-005, all the witnesses that testified against Judge Ademiluyi were influenced by Judges Cotton or Pearson.


**Judge Ademiluyi's Swift Removal From the Bench**

38.     Ademiluyi commenced this action on December 29, 2023.

39.     About three days after initiating this federal case, the Supreme Court of Maryland (not acting as a Court but an agency policing itself) placed Judge Ademiluyi on administrative leave with pay upon their receipt of a letter from the Commission enclosing a copy of the lawsuit, opining that administrative leave was necessary "to maintain public confidence in the judiciary" and "ensuring the continuing orderly administration of justice" in light of the federal lawsuit.

40.     On January 25, 2024, the Commission amended its charges against Judge Ademiluyi, alleging Ademiluyi committed sanctionable misconduct by filing this lawsuit.

41.     To prevent litigating the issues in this federal lawsuit, that same day the Commission entered an order prohibiting Judge Ademiluyi from questioning Judges Cotton and Pearson at their depositions on the following topics:

Judge Ademiluyi's allegations about being sexually assaulted in 2012; anything concerning the individuals who allegedly committed the sexual assault in 2012; Judge Ademiluyi's allegations about various judges forging her signature on court orders; Judge Ademiluyi's allegations about various judges improperly monitoring her emails; Judge Ademiluyi's allegations about being a "whistleblower" for wrongdoing within the Circuit Court for Prince George's County; the basis for Judge Sheila R. Tillerson Adams' choice to retire; allegations concerning First Amendment retaliation; the subject matter, causes of action, and/or alleged injuries and damages raised in Judge Ademiluyi's federal lawsuit against Judge Sheila R. Tillerson Adams (Ret.), Judge DaNeeka V. Cotton, and Judge Michael R. Pearson in the United States District Court for the District of Maryland, Case No. 8:23-cv03526-LKG; and any alleged sanctionable conduct that was charged against Judge Ademiluyi within the four-corners of the Statement of Charges in CJD 2022-079.

42.    At the same time Judge Ademiluyi filed this lawsuit to adjudicate her First Amendment rights, she sought three months medical leave to accommodate the stress caused by the retaliation.

43.    From September to December 2023, the Commission subjected her to hostile, high volume, fast paced litigation that she could not adequately participate in or defend and simultaneously perform her judicial duties. Up until she requested leave, Judge Ademiluyi prioritized her judicial duties and did so as the rules require.

44.    In further retaliation, the Commission used Ademiluyi's request for sick leave to justify initiating another action against Ademiluyi seeking a mental health examination. Investigative Counsel initiated a third matter, CJD2024-007, into Judge Ademiluyi's mental fitness solely based on her statements that she was suffering from stress from the retaliation and needs time off to recuperate.

45.    On March 22, 2024, Judge Ademiluyi provided Investigative Counsel with documentation that she has received adequate treatment and is ready and fit to return to her duties.

46.    But Investigative Counsel seeks Ademiluyi's medical records and to compel Ademiluyi to undergo a mental health examination with a doctor of her choosing.

47.     The Commission concluded two days of the 2023-005 hearing on April 29 and May 2, 2024, with one day remaining on May 10, 2024. At the hearing, Judge Ademiluyi was prohibited from presenting evidence and questioning witnesses on any of the topics in the protective order.

48.     On May 6, 2024, the Supreme Court of Maryland (not acting as a Court but an agency policing itself) accepted the Commission's findings of facts in the CJD 2022-079 case. Ignoring the Commission's recommended sanctions, the Maryland Supreme Court (not acting as a Court but an agency policing itself) summarily removed Judge Ademiluyi as a Judge on the Circuit Court for Prince George's County.

49.     On May 7, 2024, the Commission stayed CJD 2023-005.

### COUNT I TORTIOUS INTERFERENCE WITH A CONTRACT

### Systemic Corruption in the Prince George's County Circuit Court

50.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

51.     In January of 2024, Judge Ademiluyi hired Planet Depos to provide a court reporter and conference room for the depositions of Cotton and Pearson for the CJD 2023-005 case on February 13, 2024 and February 26, 2024.   Judge Ademiluyi's counsel engaged Planet Depos on her behalf.

52.     As part of the contractual relationship, Judge Ademiluyi gave Planet Depos the discretion to select the court reporter for Judge Pearson and Cotton's deposition. Planet Depos selected their independent contractor, Carla Andrews.

53.     On the day of Judge Pearson's deposition, Judge Ademiluyi had no reason to believe that anyone would interfere with her relationship with the court reporter.

54.    Carla Andrews ("Reporter Andrews") has been a court reporter for 30 years and an independent contractor for Planet Depos for 10 years. Judges Cotton and Adams, both long time judges, run the Prince George's County Circuit Court that regularly employs court reporters.

55.    On February 13, 2024, Judge Ademiluyi deposed Pearson. The parties present who identified themselves on the record at the deposition were Judge Ademiluyi and her counsel, Assistant Attorney General James Spiker representing Judges Cotton, Adams, and Pearson and Investigative Counsel Tanya Bernstein, Assistant Investigative Counsel Derek Bayne, and Assistant Investigative Counsel Tamara Dowd.

56.    At his deposition, Judge Pearson denied making the oral statements that Investigative Counsel alleged he made to her in her written summary of his statement attached as Exhibit A to the Complaint.  Judge Pearson denied the falsehoods in the statement strategically designed to harm Judge Ademiluyi. Judge Pearson testified that he never took issue with nor discussed with Investigative Counsel any personal text messages Judge Ademiluyi sent him that one might perceive as salacious if the conversation is between male and female. Judge Ademiluyi was trying to line up allies to assist her because she was being retaliated against.  Judge Pearson testified that the only reason Investigative Counsel had personal messages between Judge Ademiluyi and him was because Investigative Counsel asked for copies of all communications between him and Judge Ademiluyi.

57.    On February 26, 2024, Judge Ademiluyi deposed Judge Cotton, and that same day Planet Depos provided Judge Ademiluyi with a copy of the recording of the deposition.

58.    Planet Depos regularly provides a copy of the audio of depositions without the parties making the request when the depositions are recorded with digital reporter software.

**Fabrication of Evidence**

59.     On or about February 27, 2024, Judge Ademiluyi received the draft transcript of Judge Pearson's deposition testimony.

60.     The transcript of the deposition was fabricated and contained many material inaccuracies. The fabricated transcript created testimony that matches Investigative Counsel's summary of Judge Pearson's statement to her attached as Exhibit A to the Complaint. This was a false narrative to discredit Ademiluyi's rape experience, mischaracterize her as mentally unfit and cause job loss, severe emotional distress, and embarrassment.

61.     Reporter Andrews used the internet to transmit the fabricated transcript to Planet Depos and had many email communications with them thereafter misrepresenting the truthfulness of the transcript and the destruction of the recording.

62.     On or about March 4, 2024, Judge Ademiluyi requested a copy of the recording of the deposition from Planet Depos and Planet Depos informed Judge Ademiluyi that because the deposition was alleged to have taken with a stenographic machine, it is their policy to push the custody of the recording onto the court reporter. Therefore, they did not have possession of the recording.

63.     On or about March 4, 2024, Planet Depos offered to contact Carla Andrews to request that she listen to the recording where the transcript is inaccurate. Judge Ademiluyi requested Andrews listen to the recording on a couple out of the several pages that Judge Ademiluyi knew was fabricated.  Planet Depos conveyed that Andrews confirmed the accuracy of those pages.

64.     Judge Ademiluyi knew Reporter Andrews was not being truthful and questioned her further through emailing and speaking to an Operations Specialist at Planet Depos.

65.     Prior to the start of the deposition, Judge Ademiluyi observed Reporter Andrew's recording setup and inquired from Andrews about how she could get a copy of the recording. Judge

14

Ademiluyi and her counsel sat near Andrews and observed her record the deposition and simultaneously use a laptop throughout the proceedings.

66.    Reporter Andrews falsely stated in an affidavit attached to the transcript that the deposition was recorded contemporaneously with a stenographic machine.

67.    Judge Ademiluyi brought to the attention of Planet Depos that there was no stenographic machine, and through Planet Depos, Reporter Andrews falsely replied that she used the stenographic machine in her lap.  Reporter Andrews did not have any such stenographic machine in her lap or in the room. Andrews sat at the conference table with her laptop in front of her while she monitored the live feed of the recording from her laptop.

68.    Reporter Andrews created a stenographic file after the deposition to give to Planet Depos to create a false appearance that she used the machine at the deposition.

69.    Judge Ademiluyi requested a copy of the recording from Reporter Andrews through Planet Depos, but Judge Pearson and Investigative Counsel immediately objected to Planet Depos releasing the recording.

**<u>Motives For Evidence Tampering</u>**

70.    Judges Cotton and Adams' plan to use Pearson was extreme and outrageous, and built on all lies. From 2016 to 2020, among Prince George's County residents, Judge Ademiluyi publicly spoke about her experience of being drugged and raped by lawyers in 2012. When she sought accountability, her efforts were stymied by public corruption. Judges Cotton and Adams sought to use Judge Pearson to discredit and torment Judge Ademiluyi about that experience in retaliation for the public corruption complaints she made against them. Exhibit A-B.

71.    Two of the few truthful substantive statements Judge Cotton made in her deposition testimony was: Judge Pearson did not want to take part in her malicious plot for revenge against

Ademiluyi and she aggressively caused Investigative Counsel to open the CJD 2023-005 investigation on Judge Pearson's behalf without his knowledge.

72.     Judges Cotton and Adams wielded major influence over Judge Pearson.

73.     Judge Adams mentored and had administrative authority over Judge Pearson for 12 years. And most in the courthouse feared going against Judge Adams.

74.      Another problem for Judge Pearson was that he and Judge Cotton were in a romantic relationship that they maintained in secrecy.  Judge Cotton is married to Joseph Cotton, an attorney, who is well known among the judges in the Prince George's County judiciary, including Judge Pearson.  The steamy affair between Judges Pearson and Cotton went on for years. Phone records show that these two could not get enough of each other all day at work, after work, and all night.

75.     Their heavy, consistent cell communications ongoing for years that confirms their romantic affair, suddenly ceased a couple months after Judge Cotton caused the CJD 2023-005 investigation. Judge Pearson also has the same phone patterns with his assistant, Lesley Holmes, as he has with Judge Cotton and his cellular phone communications with them cease at the same time.  Judge Pearson and his assistant, Ms. Holmes, also deny the existence of a romantic relationship. The sudden lack of cellular communication for over one year suggests that Judge Pearson is avoiding a paper trail on his multiple inappropriate, romantic relationships in the workplace.

76.     Judges Cotton and Adams initially succeeded in getting Judge Pearson to play the role to help them get revenge and causing the CJD2023-005 charges. Phone records confirm communications between Judge Pearson and Adams just before Judge Pearson and Cotton's first meeting with Investigative Counsel.

77.    Judge Cotton told the Commission she wanted revenge for the complaints Ademiluyi filed, and she was relentless in her pursuit. Exhibit E.

78.    But Judge Pearson did not expect the CJD 2023-005 charges to occur. Judges Cotton and Adams' plot for revenge was spiraling and becoming a public spectacle. This caused Judge Pearson to again become very reluctant to participate.  Judge Cotton and others had to set Judge Pearson up with Reporter Andrews who would change his testimony, because they knew he was going to fail. And he did fail them.

79.    To bring Judge Pearson's deposition testimony in line with Judges Cotton and Adams as well as all their statements given to Investigative Counsel, they had to fabricate the transcript.

80.    What started as a plot to retaliate for Judge Ademiluyi's public corruption complaints quickly turned into Judge Cotton fearing Judge Ademiluyi would interfere with her romantic affair with Pearson. Judge Cotton knew that Judge Pearson had a romantic interest in Judge Ademiluyi. Prior to Judge Cotton causing the opening of CJD2023-005 investigation, Judge Ademiluyi did not know, or suspect Judge Pearson had any sexual interest in Judge Cotton.

81.    Judge Cotton's jealousy as Judge Pearson's romantic partner prevented Judge Pearson from communicating and working with Judge Ademiluyi. In February 2023, Judge Ademiluyi received notice that Investigation was investigating CJD2023-005.  Judge Cotton made her sexual interest in Judge Pearson clear to Judge Ademiluyi and emphasized numerous times that Judge Pearson had not caused the opening of CJD 2023-005 investigation.

82.    In April 2023, Judge Ademiluyi saw a flirtatious interaction between Judges Cotton and Pearson in front of Judge Lawrence Hill. In two meetings between February and May 2023, before and after seeing the flirtatious interaction between Judges Cotton and Pearson, Judge Ademiluyi told Judge Cotton she had no sexual interest in Judge Pearson and sought only an

amicable professional relationship, but this was insufficient for Judge Cotton. Judge Cotton insisted that Judge Ademiluyi and Judge Pearson would never speak again and that they must communicate only in writing.

83.    On other subsequent interactions, Judge Cotton demonstrated jealousy over Ademiluyi's physical appearance, for e.g., commenting on her disgust at Judge Ademiluyi's body being so physically fit.  Ademiluyi is athletic, whereas Cotton is a much older plus-size woman. Judge Cotton often made Judge Ademiluyi very feel uncomfortable with her jealous remarks about Judge Ademiluyi's physical appearance.  To alleviate her fears that Judge Ademiluyi might diminish Judge Pearson's sexual interest in her, Judge Cotton demanded assurance that Judges Ademiluyi and Pearson would never see each other again.

84.    Judge Cotton's deposition testimony revealed her sexual interest in Judge Pearson. Judge Cotton demonstrated anger and jealousy over the text message invitation Judge Ademiluyi sent to Judge Pearson inviting him to spend time with her so she can get his help with overcoming the retaliation.  For e.g., Judge Ademiluyi's text to Judge Pearson that they need to work out their tension; he can call her anytime; and she is always up late understandably upset his scorned lover, Judge Cotton, because their phone records show voluminous communications between them all hours of the night.  But Judge Cotton, clearly being untruthful, denied having a romantic affair with Judge Pearson.

85.    Judge Pearson, in his deposition, also being untruthful, denied having a romantic affair with Judge Cotton.

86.    Judge Cotton is dangerously obsessed with keeping her clandestine romantic affair with Judge Pearson and she thought Judge Ademiluyi would destroy that relationship.

87.    Joseph Cotton is telling members of the community that his wife, Judge Cotton, will "destroy" Ademiluyi. Exhibit A.

88.    Judge Cotton conspired with Andrews to make false, material changes to Judge Pearson's deposition transcript to harm Judge Ademiluyi.

89.    Judge Cotton is the only person who could have created some parts of the fabricated transcript. For e.g., the transcript details a conversation Plaintiff Ademiluyi had first with Pearson, on April 28, 2023, and a week later with Cotton about Pearson, without authority, presiding over Plaintiff Ademiluyi's violation of probation case.    Cotton and Pearson subsequently spoke to Investigative Counsel, on April 28, 2023, about the discussion between Pearson and Plaintiff Ademiluyi. Plaintiff Ademiluyi did not tell Cotton the name of the case or give much detail about what happened.    Cotton drafted the transcript to say that Pearson was presiding over the case because: it was his assigned case that the courtroom clerk called him to take and Plaintiff Ademiluyi had only presided over the case while she was training. This was also Investigative Counsel summary of Pearson's statement to her.    But the violation of probation case was never assigned to Pearson nor was it assigned to Plaintiff Ademiluyi while training.    In their discussion, Pearson apologized to Plaintiff Ademiluyi for taking her case. Pearson attempted to cover up his secret lover's mistake and change this testimony at the public hearing to avoid impeachment.

90.    At the conclusion of Investigative Counsel's investigation, she produced a statement summary purportedly given by Pearson; however, the substance of the summarized statement was provided to Investigative Counsel by Cotton.    Cotton was so obsessed with maintaining her romantic relationship with Pearson that she not only provided the substance of Pearson's "statement" to Investigative Counsel, but she also corruptly influenced the court reporter, whom Cotton had a relationship with, to change Pearson's deposition testimony to be consistent with Cotton's prior statement to Investigative Counsel.    Albright prevented Plaintiff Ademiluyi from asking Pearson or any other witness questions about statements provided to Investigative Counsel both during depositions and at the public proceedings.

91.     Prior to Pearson's deposition, Reporter Andrews directly or indirectly had a relationship with Judges Adams and Cotton. Unbeknownst to Judge Ademiluyi and her counsel, Cotton selected Reporter Andrews to be the court reporter that Planet Depos used for Judge Pearson's deposition.

92.     Judge Cotton, as the Administrative Judge, can use her authority and return the corrupt favor Reporter Andrews gave her in this case by hiring Reporter Andrews at any time to perform work at the Circuit Court for Prince George's County and pay her a generous compensation. Reporter Andrews is currently seeking better job opportunities.

**Destruction of Evidence**

93.     On or about March 5, 2024, Planet Depos immediately secured a copy of the audio recording from Reporter Andrews.

94.     At this point, Planet Depos indicated they were a neutral party and would not release the audio without a court order or agreement from the parties.

95.     Pearson and Investigative Counsel actively sought to block the release of the audio recording of the deposition.

96.     Planet Depos supports taking action that will ensure the integrity of the deposition process. All their depositions are recorded by audio or audio-video means to ensure the accuracy of a transcript. A stenographer must have the option to listen to a recording after the deposition to ensure the accuracy of the transcript. And the stenographer, under judiciary retention policies, must retain the recording.

97.     On or about March 13, 2024, with his secret lover, Judge Cotton, going to extraordinary lengths to undermine him, Judge Pearson caved to Judge Cotton's pressure. Judge Pearson had to appease the jealous rage of his scorned lover, Judge Cotton, who felt Judge Ademiluyi was threatening their relationship. Judge Pearson thus solidified his place in the

criminal conspiracy to harm Judge Ademiluyi by signing an affidavit endorsing the transcript with no changes.

98.    The next day Albright blocked Judge Ademiluyi from listening to the recording.

99.    Planet Depos subsequently assisted Judge Ademiluyi in investigating the suspicious behavior of her adversaries and found that the recording Andrews provided them with was inaudible, and a transcript could not be prepared or verified from the recording.

100.    Andrews alleges she created two copies of the recording. But she further alleges that one copy was immediately erased, and the other is conveniently inaudible for 3 hours except for the one-minute portion Judge Ademiluyi asked her to verify. Judge Ademiluyi tested Reporter Andrews truthfulness on a couple out of the several pages that were fabricated. Any recording that happens to be partially audible or audible only on the couple pages of the deposition transcript that Ademiluyi asked Andrews to verify is fake.

**The Impact of Evidence Tampering**

101.    Judge Pearson, who initially was trying to get himself out of some of the lies orchestrated to harm Judge Ademiluyi changed his mind.  The fabricated transcript and his testimony at the public hearing was the opposite of his deposition testimony. Pearson testified publicly that he filed a complaint against Plaintiff Ademiluyi because she was sending him salacious text messages and he wanted her to leave him alone.  Pearson had to go to great lengths to cover up the jealousy of his scorned lover, also lying that he filed the complaint against Plaintiff Ademiluyi. This was consistent with the statement Pearson allegedly gave to Investigative Counsel and what Cotton wanted him to say.

102.    Investigative Counsel, despite their knowledge that Pearson's deposition transcript had been altered, called Judge Pearson to provide false testimony.

103.    Investigative Counsel and Albright enforced the judiciary's official policy and custom of retaliation. Investigative Counsel was retaliating against Judge Ademiluyi for her public corruption complaints and this federal lawsuit against her colleagues that pleads dishonesty of the Commission.   At Investigative Counsel's request, Albright, also retaliating, prohibited Judge Ademiluyi from putting on a case in CJD 2023-005 and impeaching Judge Pearson at the public hearing.

104.    Reporter Andrews, acting with malice, interfered with the contract between Plaintiff Ademiluyi and Planet Depos by assisting her coconspirators in producing a fabricated deposition transcript and destroying the audio recording of the deposition.

105.    Reporter Andrews, Judge Cotton and Judge Pearson caused Planet Depos to breach their contractual obligation to provide honest court reporting services at a deposition.

106.    Reporter Andrews, Judge Cotton and Judge Pearson violated numerous criminal statutes.

107.    Reporter Andrew's dishonest, corrupt court reporting services helped her coconspirators succeed in their plans to viciously attack Judge Ademiluyi. They revictimized her, attempted to discredit her rape experience, asserted mental instability, and inflicted severe emotional distress.

108.     Reporter Andrews, Judges Cotton and Pearson's malicious interference with Judge Ademiluyi's contract with Planet Depos caused Judge Ademiluyi to experience reputational harm, anxiety, depression, emotional distress, attorney fees, and costs.

109.    Planet Depos charged Plaintiff Ademiluyi $826.05 for Pearson's deposition and a higher amount for Cotton's deposition, which Plaintiff Ademiluyi had no insurance to cover.

**Obstruction of Justice**

110.    Judges Cotton and Pearson have engaged in a pattern of abusing their authority to intimidate Plaintiff Ademiluyi and interfere with Plaintiff Ademiluyi's right to complain about their violations of federal law.

111.    Plaintiff Ademiluyi initially sued Reporter Andrews in Washington DC Superior Court on August 19, 2024. Plaintiff Ademiluyi dismissed it on October 10, 2024, to litigate the issues in this court. In that matter, Reporter Andrews refused to answer all discovery requests served on her.

112.    On August 26, 2024, Judge Pearson and his secret lover who is also his assistant, Ms. Holmes, used Monet Hurley, Plaintiff Ademiluyi's former courtroom clerk to reach out to Plaintiff Ademiluyi to deceive her into providing information that Ms. Hurley can give to Ms. Holmes and Judge Pearson to harm Plaintiff Ademiluyi.   Ms. Holmes and Ms. Hurley have a friendship, they are hiding from Plaintiff Ademiluyi.  Plaintiff Ademiluyi did not communicate with Ms. Hurley. Judge Pearson knew of the lawsuit against Reporter Andrews that had neither his nor Judge Cotton's name on it before Plaintiff Ademiluyi gave Judges Cotton and Pearson and anyone other than Reporter Andrews notice of the lawsuit.

113.    In early September 2024, Judge Cotton summoned Plaintiff Ademiluyi to report to jury duty in October 2024 to lure her to the courthouse, intimidate her, and prevent her from pursuing this case and complaining about the criminal conspiracy to harm her.

114.    Judges Cotton and Pearson used a similar intimidation tactic on Judge Ademiluyi in January 2024 after she was banned from the courthouse. Judge Cotton assigned Judge Pearson, the only case pending in the Circuit Court for Prince George's County where Judge Ademiluyi's counsel, Craig Brodsky Esq., was the lawyer on record. It was a personal injury case scheduled for a settlement conference, in which sitting Judges only preside over if there is no senior/retired judge available.

115.    Prior to the filing of this federal lawsuit, Judges Cotton and Pearson's attorney, James Spiker, declined multiple requests from Judge Ademiluyi's counsel for a mediation or meeting to resolve the matter amicably with Judge Pearson because Judge Pearson's scorned lover, Judge Cotton, would not allow it.

116.    After the filing of this federal lawsuit, Judge Pearson, abusing his power as a judge, intimidated Judge Ademiluyi's lawyer to appease the rage of his scorned secret, lover Judge Cotton.

117.    Judge Pearson stood over Craig Brodsky, Esq. in a doorway and berated him about this federal lawsuit when Mr. Brodsky appeared before Judge Pearson on his personal injury case. Pearson admitted to this intimidation tactic in his testimony at the public hearing for CJD2023-005.

WHEREFORE, Plaintiff Ademiluyi prays this Court awards: a) Compensatory damages in excess of $75,000; (b) Punitive damages in an amount to be determined at trial; (c)Attorney fees; (d) Costs to include cost of the deposition; and (e) any such other and further relief as the Court deems just and proper.

**COUNT II INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

118.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

119.    Reporter Andrews, Judge Cotton, and Judge Pearson conspired to intentionally inflict severe emotional distress on Judge Ademiluyi through making, endorsing, or using the fabricated deposition transcript.

120.    The criminal conspiracy of Judge Cotton, Judge Pearson, and Reporter Andrews formed to cause Judge Ademiluyi severe emotional distress and job loss was extreme and outrageous.

121.    Judge Cotton, a married woman, having an affair with Judge Pearson and engaging in a criminal conspiracy to "destroy" Judge Ademiluyi's career and reputation because Judge Pearson has a romantic interest in Judge Ademiluyi is extreme and outrageous. Exhibit E.

122.    Judge Pearson facing Judge Ademiluyi in the deposition and giving testimony to undermine Cotton, his jealous lover's, plan to harm Plaintiff Ademiluyi and then later joining a criminal conspiracy to change his testimony to harm Plaintiff Ademiluyi is extreme and outrageous.

123.    Reporter Andrews, a corrupt court reporter, who conspired with Judge Cotton to alter Judge Pearson's testimony, then lied about it and destroyed the recording of the deposition is extreme and outrageous conduct.

124.    Judge Ademiluyi had just completed treatment from a mental health provider for anxiety and stress caused by the retaliation.  The manipulation of Judge Pearson's deposition testimony worsened Judge Ademiluyi's condition causing her to suffer severe emotional distress. For months after Pearson testified at the public hearing, Ademiluyi experienced severe depression and anxiety such as crying spells, inability to sleep, eat, and engage in other normal daily activities.  To date, she still experiences relapses of these same symptoms that interfere with her ability to work.

WHEREFORE, Plaintiff Ademiluyi prays this Court awards: a) Compensatory damages in excess of $75,000; (b) Punitive damages ; (c)Attorney fees; (d) Costs including the cost of the deposition; and (e) any such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues triable by right of jury, including the issues punitive damages and other damages.

Respectfully submitted,

_____/s/_____
Ray Shepard, Esq.
Federal Bar No: 09473
The Shepard Law Firm, LLC
122 Rivera Drive
Pasadena, MD 21122
Office: 410 255-0700
Fax: 443-773-1922
Ray@shepard.law
Michelle@shepard.law

__/s/ *Allen R. Dyer*__
Allen R. Dyer, Esq.
Federal Bar No: 19624
Law Office of Allen R. Dyer
13340 Hunt Ridge
Ellicott City, Maryland 21042
410-531-3965 / aldyer@lawlab.com

*Attorneys for April T. Ademiluyi*